v. Lexington Insurance Company. All right, is the appellant ready to proceed? May it please the Court, my name is Todd Lipscomb, and I represent Norling Property, LLC. Norling was hit by Hurricane Ike, was damaged by Hurricane Ike. Carriers paid approximately $400,000 in damages to that property. When there's disasters like this, the first line to rebuilding is property insurance. It doesn't concern itself with liability. It's designed to get people back on their feet as soon as possible. The Texas legislature has recognized that and imposed a statute that, in many ways, not only the amount of payment is important, but the timeliness of it. That's the Texas Prompt Payment of Claims Act. It adopts a procedure for both what must be done statutorily to adjust a claim as time periods for paying a claim, a maximum of 75 days. In this case, Norling did not receive its payment for over 15 months. We're seeking the 18% required interest for that time period. You're talking about the 70, so you're saying the $75,000 payment was untimely. That's your reduced argument? No, Your Honor. There is an initial $75,000 payment made by Lexington shortly after the claim. I think it was the 11th claim that was paid. Fifteen months later, the excess carrier, Max Specialty, paid $245,000, and then another $95,000 approximately was paid by the third level of insurance. And that gets us to the key issue. We're not seeking the interest on the $75,000 payment. We're seeking the delay on the payment of the $245,000 and the additional $95,000 that was caused by Lexington, even though the excess carriers paid it. So you're saying Lexington pays for the untimeliness of Max Specialty? It's not their untimeliness. Under Texas law, an excess carrier does not have a burden to pay the claim until the underlying policy limits are fully exhausted. Lexington did not claim or did not give notice that the underlying policy limits were exhausted until January 2010, which is approximately 15 months. So that time period from when the claim is turned in until they then turn it over to the excess carrier, that's the time period we're seeking the money for. And the reason for that is a very clear policy reason and that the statute is designed to encourage the prompt payment of claims. If this was only one insured, not a group policy with multiple first-party insured people, there's no dispute they'd owe the claim. We didn't exceed the $25 million in policy limits. They would owe it for the 15 months. There's no dispute about it. The difference here is that because they took their time in paying Nordling, that $25 million balance got exhausted. And so what they're looking for is we don't owe this money because we took so long paying other people, someone else had to pay the claim for us. There's no defense to liability. They paid it. Max specially paid the $241 on the property. The other $95 was paid by the third-level carrier, and we're not complaining about the timeliness of what they did. What we're complaining about is that a company like Lexington shouldn't be rewarded by picking and choosing which people it's timely on and able to avoid the penalties by refusing to pay people who turned their claim in first. Your position is you've been paid in full, and every payment you got was timely from the person who paid it to you. From the person who paid it. But you think Lexington still should be liable for the untimeliness of the excess carriers? What's your best authority for that? And it's a novel issue under Texas law. There is none. But in Texas law, the statute itself would seem to say, Lexington, there is no claim pending against Lexington. You call in the brief an initial and an advance payment, but I didn't see in the record any support for that. Look, that was your claim, and they paid it. There's no dispute that they advanced $75,000. We turned in an estimate over $1.2 million. They said we don't have enough information to decide that yet. We're still adjusting it. And they adjust it for 15 months. And what I want to clarify here is Max Specialty, the second liability attached to their layer, got on the claim, got it paid. When Max Specialty exhausted its policy limits, the third layer got on the claim, got it paid. Lexington caused the delay in that exhaustion, that $25 million. There's nothing that says they couldn't have paid, rather than $75,000, the full $400,000. They chose not to. And then as that time continued to tick, as they realized they had blown those deadlines, they simply handed it off to somebody else. Well, if you don't like that situation, you didn't have to buy that kind of insurance to begin with. In terms of a group policy, Your Honor? Absolutely. That is true. Your client made the decision to buy that kind of insurance, and so you might say he got what he paid for. There's nothing in the statute that says that because it is a group policy, those deadlines don't apply to you. Well, what happens if you go ahead and they pay the $400,000, whatever the total amount of the claim is here, and then there's a group of other insurance companies who say, ah-ha, I mean other insureds who say, oh, look what happened here. There's no problem here of a situation where there wasn't enough money to go around. The claims got paid. It is a question of how quickly it got exhausted. We were the 11th claim that got turned in. That's why we got that initial advance. If they wanted to exhaust that $25 million because it was so obvious that there was a large number or volume of claims, the solution is simple. You tender the $25 million up front, and then it's a max specialties problem, which is exactly what happened 15 months later. And that's all we're seeking here is that they had 75 days to do it. Instead, they took 15 months. Whether it's a group policy or an individual policy, that statute doesn't get abrogated by it. That statute clearly applies. Even if it was a group policy, yet Nordling was the only complex damaged, and they took those 15 months to do it and make the final payment, they know it. The only difference here is they chose to pay others first during that exhaustion process. And it's not max specialties problem. It's not the third layers problem. It's solely on Lexington and its adjusters. And what the court says, the trial court, is very clear on this. It says without a breach of contract claim, it cannot exist. That's wrong under Texas law. The Lynn case out in 2013 goes directly against that out of the San Antonio Court of Appeals and side in our brief. In that case, it was a hail claim. United Fire came forward, paid $2, $3 million on the claim. There were disputes about the remaining balance. The court came back and said, regardless of what happens with that remaining balance, you were not timely on that $2 or $3 million. It doesn't matter whether you breached it or not. You breached the statute. You owed the $2 to $3 million and awarded the 18% interest and fees based upon that. And for that reason, the summary and judgment order, based upon a breach of contract, is flawed in and of itself. The second reason it's flawed is expressed in the order he says that Lexington acted in good faith. And that's a little difficult because he denied all discovery in the case. All discovery. Refused to enter a scheduling order, although he sat on the summary judgment for over two years. Didn't get a chance to do discovery on it. But now it's important because the Cater case, also out of the San Antonio Court of Appeals, expressly holds good faith is never a defense to the statute. Higginbotham Fifth Circuit case from the 1990s says it's a strict liability statute. There is no good faith defense. Those are irrelevant issues that the court based its decision in summary judgment upon. One, that it has to have a breach of contract. False. Two, that they acted in good faith. Well, one, there's no evidence of it. But two, even if true, it is irrelevant because these deadlines are mandated by the state of Texas. It's not a bad faith claim. It's simply a claim for interest and attorney's fees. There's a second issue, dealing with jurisdiction. I don't know if the court wants you to move on to that or continue to address this. Before you get off that, what's – it was February of 2013 the status report from you indicated no outstanding claims against Lexington. Is that correct? No, Your Honor. Close. There is a status report from our firm that was required to be issued by the court. Judge Hughes is calling us over every few months saying if you don't attend, your case will be dismissed. And you have to file a current status for it. He says, what pending claims are before the court? At that point, the adjusters had already been dismissed. Max Specialty had already paid off on the excess layer and the third layer had already been paid. At that point, the remaining claims in the case, after those dismissals and the payments, were the interest and attorney's fees claims pending against Lexington. Was I clear on that? Yeah, that's fine. Go ahead. You want to get to the jurisdictional question? Only if the court wants me to. I can do it either way. Well, you choose, but it's – are you pursuing it or not? Yes, we are, Your Honor. And jurisdictionally, it's all based upon fraudulent enjoinder. There's a host of law school exam issues here, but I'm going to cut through them pretty quick because you all are more intimate with this law than I am. At the time they removed it, it was based solely upon the pleadings. Unlike Griggs and the cases they cite to, even their own motion is not specific enough because what we address is the reason there's delays, the reason there are problems, is that the adjusters hired a biased investigating report based upon Nicolau v. State Law Farm that is a violation of the Texas Insurance Code. Garrison, all those cases say it's viable against an independent adjuster. Pleadings are specific enough to meet that ground. Subsequent to that, though, this case got consolidated with other cases. And so their fallback provision, realizing the pleading problem, is that there were affidavits submitted in other cases prior to consolidation that provide some evidence to pierce the pleadings. Also, there's a host of due process concerns in terms of affidavits referring to other cases that somehow then get consolidated with us as being a basis for the dismissal of our claims. Furthermore, those affidavits are inadequate because they don't address our claims at all. They go on and say at the Ridgemar or whatever alternative apartment complexes are, these are what my duties are, but there's no evidence as to what they did at the Nordling property. So then they come back and say we've got a third option now. One's not good enough, two's not good enough. We filed a 12B6 motion to dismiss or in the alternative motion for summary judgment. And attached to that, we attached two affidavits that now address the Nordling property. Judge Green had summary judgment on that before our answer date. He said I'm dismissing under 12B6, but we didn't even get a chance to answer, which was filed the next day, timely. If he's considering the evidence and those affidavits, we're entitled as a matter of law as a chance to respond. If he's not, then we're back to just the issue of whether or not it was a pleading deficiency, and we pass that test. But even those affidavits on their face, if they could serve as a basis for summary judgment, don't address that one specific issue. And that one specific issue is did these adjusters hire the engineer who came out with the $100,000 estimate, which in fact is the basis for why it all got delayed? Were they biased? Did they know that he would give them a lowball number so they could give them a $25,000 payment? And that allegation as to the non-diverse defendants is exclusively in the Third Amendment against them. It doesn't also allege Lexington Max Specialty. It does do Lexington, and there's a reason why for that. It's a catch-22 for plaintiffs whenever you have a third-party administrator of this sort, an independent adjuster. If we came out there and say that Lexington did it because they have the authority, and ultimately they're responsible for it, they come back and say, but we didn't have anybody on the ground. We didn't hire this engineer that you say is biased. That was given to us by the independent adjuster. Conversely, if we go out there and say the independent adjuster did it, they come back and say, well, guess what? We didn't have any authority to do that, or we didn't have authority to decide the claim. So even if they hired the biased person, the authority was still back in New York with Lexington. And so it's somewhat of a catch-22 that if you don't plead them specifically, especially before you have any discovery in the case, they keep moving them all around. Kind of like you see on the street and you've got to guess which one is the right one, and if they pull it up, you lose. And so when you allege these things, and these are lessons learned the hard way sometimes, you have to be specific. We know that we have to name Lexington. We know that we have to name the individual adjuster as well as his employer, Cunningham Lindsay. And the allegation is that because we don't have their internal documents, we know who was working on the file, these people in some sort of consortium made the decision to hire the biased engineer, the person that came out there and gave them the lowball estimate that allowed them to pay only $75,000 and delay our claim for over 15 months. Which is to say you had no claims exclusively against the adjusters. At this point, I'd be hard to answer that question only for this reason. If Lexington were to step up to the plate and say we were solely responsible for it, and the discovery in the email showed they picked the engineer, we'd be in a much more difficult situation. I don't expect that to be the case, because they didn't say that in their affidavits. In fact, they didn't address the issue at all. It's their burden to establish that for removal jurisdiction. They have a heavy burden in doing so and must conclusively establish it. I think if it was that clear, were their adjuster did not hire this person, that was a decision made in-house at Lexington, we would have seen that in at least some of the evidence they've submitted. They have not, and we've never been allowed to do a discovery on any additional evidence. So that's why I'd be hesitant to answer it definitively at this time. If there are no further questions, I'll see you the rest of my time. Thank you. Thank you. May it please the Court, the district court in this case correctly granted a summary judgment for Lexington on Nordling's claim under Chapter 542 of the Texas Insurance Code. As we've already discussed and you've seen in the briefs, Lexington exhausted the full $25 million of its limits under this group policy, paying claims to over 100 different insurers as a result of property damage as a result of Hurricane Ike. As the trial court correctly held, there was never any evidence that Nordling had a valid claim at the time that Lexington exhausted the policy. Within three months of Hurricane Ike, Lexington began investigating the claim and made a $75,000 advance payment to Nordling, but there was no evidence and Nordling never put forth any evidence in the summary judgment record or otherwise to suggest that before the policy exhausted, they had presented a valid proof of loss, put forth a claim for the amount that they now claim that they were entitled to and the amount that they were fully paid by their excess insurers. The only evidence, and they didn't even put this forth as summary judgment evidence, but the only evidence that was ever even discussed in the trial court below was a claim that Nordling made at the first hearing in 2011 in which they said that there was a spreadsheet that they claimed was prepared by Lexington in May of 2009 before exhaustion that they claimed would have established that Lexington knew there was a claim for these additional amounts. Well, it turned out in a joint status report to the court, they reported the fact that that spreadsheet was actually prepared by the excess insurer, not by Lexington or by any of Lexington's adjusters, and therefore that spreadsheet was no evidence of the fact that there existed a valid claim at the time of policy exhaustion. In the absence of a valid claim, there can be no liability under Chapter 542. There is no evidence in this record to suggest that anybody with Lexington knew or should have known that there was a claim in existence before the policy exhausted, and in the absence of a valid claim at the time the exhaustion takes away any potential claims because, of course, they no longer have any money to pay future claims, so that extinguishes all Chapter 542 liabilities. So under the facts of this case and the record before the district court, there's no question that the summary judgment was properly granted. And that's even under Lind, the case he's principally relying on? Lind wasn't a group policy, right? That is correct. Lind was a case in which the insurer specifically admitted that it owed the limits of its policy as to an individual insurer. So it doesn't apply to our case at all because you have a case where the insurer expressly recognized and admitted that it owed the money, but it was late in paying the money. So that case, which I'll note is not a case out of the Texas Supreme Court. It's out of one of the intermediate courts in Texas, does not apply here to the facts of this case. I want to briefly turn to the jurisdiction argument because their argument in their brief is that we don't even get to the substance of the summary judgment because of the jurisdictional defect that they claim exists. But there are at least three independent reasons why this court can affirm the district court's finding of jurisdiction in this case. Number one is the fact that, and I want to preface this by saying there's no dispute that Nordling and Lexington, the two parties to the summary judgment and to the final judgment of the court, are diverse. Nordling did not, in its notice of appeal, appeal directly from the dismissal of the two allegedly non-diverse defendants, Cunningham, Lindsey, and Paul Odom. Their notice of appeal expressly appealed just the summary judgment order as to Lexington. So under Rule 3, that divests this court of jurisdiction, of appellate jurisdiction, or with respect to any complaints about the dismissal of Cunningham, Lindsey, and Odom, they have no appeal. And so therefore, the judgment is diverse and diversity, complete diversity, exists among the parties to the final judgment. The twist being one that we're going to look sua sponte at our own jurisdiction, whether they made an objection and noticed it or not. Well, again, though, the issue is the fact that the parties that would, again, there was diversity. The judgment that was entered involved diverse parties. At the time of its entry. At the time of its entry, that's correct. And so the only question is, well, was the, so they would have had to have appealed the dismissal of the non-diverse parties because they didn't appeal the dismissal of Cunningham, Lindsey, and Odom. That takes away any concerns about the jurisdiction of the court. The second. So you're saying that issue is not before us and we can't examine it even in pursuit of a question about whether or not we have jurisdiction. Is that what you're saying? I believe that's correct. The upshot of it is that because they can't appeal the dismissal of Cunningham, Lindsey, and Odom, then the issue becomes was the final judgment entered by the court, was there jurisdiction to enter that judgment? And the answer is yes because they have waived any appeal as to the dismissal of the non-diverse parties. Do you have any case that applies waiver in that context? I'm sorry? Do you have a case that applies waiver in that context? I don't believe I have a specific case that deals with that. But I'll mention the two other independent grounds on which this court can affirm with respect to jurisdiction. Number one is that we do believe that the court was correct in denying Nordling's motion to remand because the allegations, as the court has pointed out, were general as to Lexington, Cunningham, Lindsey, and Odom. There are no specific facts that were alleged as to Cunningham, Lindsey, and Odom, the non-diverse defendants. And in fact, there are very conclusory allegations, allegations that would not survive a 12B6 type inquiry, which is what courts are required to do in reviewing whether or not a motion to remand was in fact properly denied. And so under the facts of this case, the motion to remand that the district court denied properly because they don't have any, just looking at the petition itself and as counsel pointed out, the record in the case, and remember this was a consolidated case with several different cases, there were previously affidavits that were filed on behalf of Mr. Odom and on behalf of Cunningham-Lindsey because this issue had come up before in the exact same context. Claims under the same policy, claims in which allegations were made against Mr. Odom and against Cunningham-Lindsey jointly with Lexington with respect to claims handling issues, and those affidavits had already been presented to the court. And so the court did not abuse its discretion in looking at those affidavits if in fact that's what the court did. So did or didn't the district court, in your opinion, pierce the pleadings and rely on those? I believe whether or not the court did is irrelevant because I think even under the bare pleadings, they don't get there under Rule 12b-6 and so therefore it would have been proper to deny the motion to remand. If in fact the court did pierce the pleadings to look at those affidavits, that would have been within the court's discretion to do that and that would have also supported the fact that there are no valid claims against Cunningham-Lindsey and Odom that would have survived a Rule 12b-6 analysis. The third ground on which this court could affirm with respect to jurisdiction is the well-established exception that the U.S. Supreme Court recognized in Caterpillar v. Lewis, which is where Nordling's post-removal admission that the only valid claims it had were those under Chapter 542. They dropped every claim that they had against Lexington under Chapter 541, the handling of claims, which of course those are the exact same claims that they were bringing against Cunningham-Lindsey and Odom. So by conceding that they didn't have any claims under 541, even though Odom and Cunningham-Lindsey had already been dismissed from the case, those claims they were conceding were not valid claims to be brought even against Cunningham-Lindsey and Odom because those were the exact same claims that they were bringing against Lexington. And so therefore under Caterpillar and under the analysis that the court has followed, the only legitimate claims that were left were those under Chapter 542, which could only have been brought against Lexington under Chapter 542. So that remedies any alleged defect that there may have been with respect to diversity jurisdiction. I do want to just bring up one other point, and that has to do with the issue about discovery in this case. Plaintiffs make a big deal alleging that the court refused to enter a scheduling order. The fact of the matter is this case, the motion for summary judgment was initially heard in April 2011. At that time Nordling filed a motion for continuance asking that the court defer so they could conduct discovery or so that they could have additional time to respond. Well, the court didn't rule on the motion until July of 2013. So there's a period of over two years that Nordling had in which they could have, first off, they could have presented their own evidence. If they had, as they now claim, evidence that there was some misadjustment, that there was some misadjustment by Lexington or by Cunningham-Lindsey with respect to the claim, if they had additional evidence to show just the fact that they had submitted a proof of loss to Lexington at some point before exhaustion, they had that evidence. They didn't need to get discovery from Lexington. That evidence should have been available to them. The other point is that at no time did they ever ask the court to enter a scheduling order in terms of filing a motion for a scheduling order, never submitted any requests formally or informally to Lexington for discovery in this matter. So for them to hang their hat on the district court's alleged refusal to enter a scheduling order to prevent them from engaging in discovery, there's no discovery that they had ever requested or pointed out to the court that they needed that would have changed the analysis with respect to the summary judgment. If there are no further questions, I will yield the remainder of my time. Thank you. Rebuttal. Oh, I'm sorry. Oh, yeah. May it please the Court. My name is Sean Higgins. I am appearing on behalf of Cunningham-Lindsey U.S. Inc. and Paul Odom. The position of the procedural position of Cunningham-Lindsey and Odom is different from the procedural position of Lexington. That is because Nordling failed to invoke this court's appellate jurisdiction over the order dismissing Cunningham-Lindsey and Odom. The notice of appeal filed by Nordling in this case makes no reference to the previous order dismissing Cunningham-Lindsey and Paul Odom. That order was entered two years earlier before the summary judgment in this case, and it makes no reference to that. There is a Supreme Court decision that speaks to a similar decision. It is the Torres decision that is cited in our brief. In that case, there is a plaintiff who is not multiple plaintiff case, and a plaintiff was not named in the notice of appeal. The Supreme Court said that the requirements of Rule 3 are jurisdictional. The plaintiff was not named in the appeal. The question is not prejudice. The question is jurisdiction. As a result, the court of appeals did not have jurisdiction. There is a decision by this court, the Capital Parks case. In that case, the appellant's notice of appeal stated that they were appealing from the judgment, and the court said, well, that notice of appeal from the judgment does not encompass, does not fairly encompass an appeal from an order denying a motion to amend. Now, there's a case that has been cited by Nordling. It is the Desautels case, and I believe that the issue in Desautels is different from the issue of whether appellate jurisdiction was established over the order of dismissal in this case. Desautels related to an order denying a motion to remand. The party appealed from the final judgment. The appellant appealed from the final judgment, but did not mention the order denying remand. What the court said is that the final judgment and the order denying remand were intertwined because the final judgment was predicated on the district court's decision that it had jurisdiction. There's another case that was cited by Nordling Trust Company of Louisiana from 1997, and the court, this court held that service, that the question of whether service was perfected was fairly encompassed in a notice appealing final judgment because the judgment was premised on the existence of personal jurisdiction, on the completion of service, and service had been objected to. In this case, the judgment that has been appealed and the judgment that was referenced, the only order referenced in the notice of appeal, is in no way predicated on the order of dismissal. If Nordling and Cunningham-Lindsay had never been dismissed, that judgment could still be before the court. So we would submit that plaintiffs of Nordling has not established this court's appellate jurisdiction. I think there may be a question that the court has. The court may have a question, well, if we found that there was no subject matter jurisdiction, that removal was improper, what would be the impact on the order dismissing Nordling and Cunningham-Lindsay? Would it become a nullity? Would it be a free-for-all where Nordling and Cunningham-Lindsay could be sued in this case again in state court? And the answer is no. There is a line of cases beginning with the Supreme Court's decision in Shecoat Drainage District v. Baxter State Bank that holds that if a court acts without subject matter jurisdiction and the court's order, the federal court's order entered without subject matter jurisdiction is not appealed, that order is still binding. It does not become a free-for-all. The order is not a nullity. It needs to be appealed even if there is no subject matter jurisdiction. Turning to the substantive question. The specificity of the pleading. The specificity of the pleadings in this case. Yeah. One can scour the petition that was filed in this case and not find any allegations against Odom and Cunningham-Lindsay alone. If the word defendant was substituted, if the word defendants were substituted for Odom, Cunningham-Lindsay, and Lexington, there would be, there is a complete lack of specificity. There's no allegation against Odom and Cunningham-Lindsay alone. The case was consolidated with other cases arising out of the same insurance policy. There were multiple affidavits filed in those other cases and those were before the court. In each instance, the affidavits established that Odom and Cunningham-Lindsay had very limited authority given to them by Lexington. Their authority was to, one, look at the property and determine whether or not the damage was likely to exceed a certain threshold. And if it did, refer the property to a contractor, an evaluator that was chosen by Lexington. That's what they did in this case. And then their third responsibility was to get the evaluation back from the contractor and to enter it into a spreadsheet. The affidavit testimony that was before the court, properly before the court, established that there were no acts, no acts by Odom and Cunningham-Lindsay. But I think if I understand it correctly, his contention is that that was more appropriate for discovery and they weren't given an opportunity to do that in this case. Is that what he's contending? I would argue that it was not because the question is whether the court had jurisdiction or did not have jurisdiction. This issue had been developed. It had been established in repeated cases across the same policy, arising out of the same policy. So I don't believe the question is one of discovery. And I believe also, additionally, and my clock says zero, so I may have outlasted my time, and I will. Thank you. Thank you. I'm hearing two different stories here. The court order says summary judgment is granted because there's no valid breach of contract. Lexington's attorney is very clever. He knows that's not the law. He knows that's an improper statement. So he's changed it now. Unlike the court order, he's saying there's not a valid claim. The problem with that is the facts don't bear this out. Lexington paid $75,000 to my client. Was this believed just to be goodwill? Is this something they didn't owe? They're saying it wasn't part of the valid claim? If so, then why did they use that $75,000 as part of the exhaustion of the $25 million? It's an indemnity payment or it's not. They booked it as an indemnity payment. It's part of the $25 million, and there's admission of liability. Not only that, then the excess carrier gets the same information and pays the claim under the policy. It just happened to be under their layer. So to say there's not a valid claim because that's what he would have to establish is simply false. But the other argument here is that he thinks that we have some sort of burden of proof on this issue when they move for summary judgment. The problem for that under a no-evidence standard is, again, we weren't given their files. We weren't given their discovery. All we had is the payment history, which we put with it and is what we established. That goes to the third issue. And, in fact, it's even stated in the judge's opinion. The parties disagree about when Norley presented a claim for payment. Putting aside the factual dispute, Norley may not recover attorney's fees and interest without their predicate, a successful breach of contract claim. So he realizes there may be a dispute about whether a claim was filed. A factual issue which would deny summary judgment. But that's not what he grants it on. He bases it upon a breach of contract, which is expressly denied by the Lynn case. You don't have to have a breach of contract. You just have to be liable for it. And for 15 months, Lexington was liable and ultimately delayed the payment of the excess carriers because they didn't make that payment. What's your support in the record for your brief characterization of the $75,000 payment as initial and advance? There's no dispute about it, Your Honor. Both sides agree that that payment was made. Your support is that there is no dispute, but they absolutely do dispute. And I'm asking you, what's your support in the record for your characterization of it as initial and advance? They – no one disputes $75,000 is paid. I know that. And so what I would characterize it as is a claim payment. They characterize it as an advance. That's not me. I would characterize it as a claim payment. But taking their language that it was an advance, that still is some evidence of a viable claim. You can't conclusively say that by paying $75,000 in any context, that's evidence that there is no claim. That's turning logic on its head. Furthermore, you do have the evidence also in the record that the remaining balance was paid by the excess carrier. Now, Lexington in the end may want to contest that, but we're not trying to enforce a summary judgment here. What we're saying is a summary judgment was granted against us, even though they admitted and paid $75,000, and their excess carrier paid it too, based upon the faulty legal premise that there was no breach of contract. Nothing to do with whether or not a valid claim has existed because the judge himself admits there's a factual dispute on that and hence a reason to deny the summary judgment. Jurisdictionally? Before you get to just factually also, in oral argument and then in their brief, they both said that your representation that you requested a scheduling order didn't have a basis in this procedural history. What's the record site for your statement that you requested a scheduling order? I don't have the exact record site, but I can point you to the document itself. Our responsive motion for summary judgment expressly indicates that we asked to do discovery and were denied it because of the scheduling order. This case was consolidated with the others, and it had a standing order that you can't do discovery until we get a trial date set. Simple. We asked for it in the summary judgment. We went to all of the hearings. We were repeatedly called over to Houston, and before a scheduling order was ever entered in the entire case, all the 100-plus plaintiffs were dismissed in some capacity. We were the last ones standing. We were the only ones that attended every hearing, fought every motion, and finally got an order out of him over two years later. And that order itself, the summary judgment against us, is all based upon a completely different argument than what you heard today, and that that has to be a breach of contract in order to support a claim for interest and penalties under Chapter 542. That's not Texas law, never has been, and the attempt to change it here today doesn't change what the judge put in his order. Thank you very much for your time. Thank you, Mr. Lutz.